U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

2022 MAY 16  AM 10: 57

CLERK

Docket No. 8 19-CV-95
DEPUTY CLERK

5:19-CV-95

FRIENDS OF PINE STREET d/b/a
PINE STREET COALITION,
        Plaintiff,

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**
**(National Environmental Policy Act, 42**
**U.S.C. §§ 4321 et seq.; Administrative**
**Procedure Act, 5 U.S.C. §§ 701-706);**
**and the Endangered Species Act,**
**16 U.S.C. §1531 et seq.)**

V.

THOMAS D. EVERETT, in his capacity as
Executive Director of the Federal Highway
Administration,

and

JOE FLYNN, in his capacity as Secretary
of the State of Vermont Agency of
Transportation,

and

MIRO WEINBERGER, in his capacity as
Mayor of the City of Burlington,
        Defendants.

## SECOND AMENDED COMPLAINT

In compliance with the Order of this Court (ECF 20) accepting the Stipulated

Scheduling Order (ECF 19), and in accordance with the Federal Rules of Civil Procedure

Rule 15(a)(2), Plaintiff is filing this Second Amended Complaint by the consent of the

Defendants, communicated in writing via email on 05 12 2022.

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 2 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 2 of 60

## INTRODUCTION

1.     The Pine Street Coalition herein challenges Defendants' determination, by their May 2, 2019 Reevaluation decision ("Reevaluation"), to proceed with the Champlain Parkway project without taking a hard look at the environmental impacts as required by the National Environmental Policy Act ("NEPA"), where the NEPA process is stale, obsolete, and inadequate, particularly in critical areas of safety, equity and environmental justice, climate change, community and natural environment impacts; and where Defendants have not assessed cumulative impacts and connected actions despite proceeding with two additional related highway projects that physically intersect, are located in the same project area, and address the same goals regarding traffic in the same neighborhood.

2.     Plaintiffs also hereby appeal the 2022 Record of Decision ("ROD") predicated on the 2021 Limited Scope Final Supplemental Environmental Impact Statement ("2021 LS FSEIS") for failure to follow required environmental justice outreach procedures, failure to consider alternatives, failure to take the requisite hard look, and other grounds as detailed below.

3.     The Burlington MEGC M5000 (1), Southern Connector/Champlain Parkway project ("Champlain Parkway" or "project") is a proposed highway running from Route 7/I-189 to the intersection of Main Street and Pine Street. *See Attachments A and B, Images of Champlain Parkway South and North Segments; from champlainparkway.gov.* The proposed project bisects the City's vibrant South End communities and historic

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 3 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 3 of 60

districts, and would involve new roadway construction as well as dead-ending

numerous local through-streets, culverting a segment of Englesby Brook, and altering

signalization through one of Burlington's poorest and most ethnically diverse

neighborhoods. The Champlain Parkway, a project of the City of Burlington ("City"),

Vermont Agency of Transportation ("VTrans"), and Federal Highway Administration

("FHWA"), has been on the drawing board since the 1960s, during which time both the

project and the natural and human communities through which it passes have

significantly changed. The pace and magnitude of those changes has increased in the

past thirteen years since this project last went through full NEPA review.

     4.     The physical context of the project in terms of development and traffic

patterns on the ground, the legal context of statutes, regulations, guidelines and

policies, and the state of environmental knowledge and concerns like climate change,

urban open space, and water quality have changed drastically since the last full Final

Supplemental Environmental Impact Statement in 2009 ("2009 FSEIS"). Primary among

those contextual changes is the progress of the Railyard Enterprise Project ("REP"),

which effectively comprised Alternative One of the 2009 FSEIS (which was rejected). *See*

*Attachment C, Image of REP Project Area, from CCRPCVT.org; Attachment D, Image of REP*

*Protect with Pine Street intersection, from CCRPCVT.org, Supplemental Scoping.* The

government agencies now propose to build **both** Alternative One (REP) **and** Alternative

Two (the Pine Street alignment, the 2009 FSEIS preferred alternative), despite having

never assessed the impacts of building both alternatives together. *See Attachment E, 2009*

*FSEIS Map Alternatives 1 and 2; Attachment F, 2009 FSEIS Description Alternative 1;*

*Attachment G, 2009 FSEIS Description Alternative 2.*

5.    Defendants' decision, as expressed in Defendants' Reevaluation, and in

the Record of Decision ("ROD") on the Limited Scope Final Supplemental

Environmental Impact Statement signed January 20, 2022 ("2021 LS FSEIS"), to proceed

with the Champlain Parkway project on the basis of the 2009 FSEIS, rather than to

prepare a full, non-limited-scope Supplemental FSEIS or, preferably, a full new EIS,

where that 2009 FSEIS is functionally obsolete and legally stale, violates the

requirements of NEPA and is unreasonable under the APA.

6.    The 2009 FSEIS utilizes and relies on policies, regulations and statutes,

data, methodology, and facts on the ground, relevant to NEPA concerns, which are no

longer accurate or applicable due to substantial changes which have occurred in the

intervening thirteen years.  The Table of Significant Changes, *Attachment H* to this

Complaint, which is herein incorporated by reference, details over 100 substantial

changes in law, fact, and knowledge which have occurred in the last thirteen years

pertaining to the Champlain Parkway and its NEPA-related impacts. Those changes

include:

- A post-2009 paradigm shift in transportation law, policy and planning guidance to emphasize safety and non-vehicular transportation, including a radical sea-change in federal statutes and FHWA regulations, state and local laws and policies, and new technologies and design approaches for pedestrian and bicycle safety and access. The 2009 FSEIS mentions "safety" a mere handful of times, and only in passing, rather than in substantive discussion. In 2015, the Vermont Supreme Court upheld a state Superior Court Environmental Division determination that if the traffic delays projected by the predictive models used by the Defendants, the project "may

experience unreasonable congestion" which "may result in unsafe conditions". *In re Champlain Parkway Act 250 Permit*, 200 Vt. 158 (2015)These post-2009 changes in the realm of transportation safety are listed in Section 1 of *Attachment H, Table of Significant Changes.*

- Changes in traffic volumes and dramatic increase in pedestrian and bicycle usage of the project area; adoption of Demand Management policies to reduce vehicular traffic; City adoption of road network connectivity policies; new traffic data and new traffic flows planned through the REP; change in rail crossings designs, and advent of AMTRAK service; development of more than a dozen new municipal and regional plans pertaining to transportation in the City. These post-2009 changes in transportation planning and systems are listed in Section 2 of *Attachment H, Table of Significant Changes.*

- The 2009 FSEIS utilized 2000 Census demographic data; two full Census rounds have been completed since then which have been ignored in the NEPA process. Like safety, equity and environmental justice have been prioritized since 2009. Demographic changes include an aging population and higher poverty rates, implicating both traffic counts and the need to consider access, safety, and public transportation. These post-2009 changes in demographs, socio-economics, and environmental justice are listed in Section 3 of *Attachment H, Table of Significant Changes.*

- Since the 2009 FSEIS, numerous rounds of municipal and regional planning have occurred which reprioritize not only transportation planning in the City, but also open space and natural resource protection and intentions for development in the project ROW. In the face of growing recognition of the importance of urban open space and trees, City planning documents post-2009 have recognized portions of the Champlain Parkway ROW as valuable recreational open space, forested open space, and critical natural areas in need of protection, particularly Englesby Brook. These post-2009 changes in recognition and prioritization of local natural resources are listed in Section 4 of *Attachment H, Table of Significant Changes.*

- After the 2009 FSEIS, Burlington's South End, the locus of the project, exploded with vibrancy and creative development, and is now the City's beehive of arts and culture as well as its economic center. Arts studios, maker centers, breweries, housing, a grocery store and farmers' market now dominate what was, when the Champlain Parkway was first conceived, industrial warehouses, railroad yards, and empty lots. These post-2009 changes in Burlington's South End are listed in Section 5 of *Attachment H, Table of Significant Changes,* and will be documented in the photo inventory which, together with affidavit from photographer Carolyn Bates, will be attached to Plaintiff's Motion for Preliminary Injunction, to be filed shortly.

- Since 2009, consideration of climate change impacts has become paramount in government development projects and transportation planning. New wetlands, stormwater, and floodplain regulation schemes have grown out of

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 6 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 6 of 60

the body of new knowledge about climate change. Increasingly clean water
concerns have led to new federally mandated Total Maximum Daily Loads
("TMDLs") for Englesby Brook and Lake Champlain. New rare, endangered
or threatened species and their habitats have been identified in and around
the Champlain Parkway ROW and impact area. These post-2009 changes in
climate change, water quality, wetlands and wildlife are listed in Section 6 of
*Attachment H, Table of Significant Changes.*

- Post 2009, the Defendants have moved forward with the REP, as well as the
  Main Street Great Streets project, which intersect, physically and in terms of
  planning and traffic modeling, with the Champlain Parkway. These post-2009
  connected actions are set out in Section 7 of *Attachment H, Table of Significant
  Changes.*

- Since 2009, FHWA and VTrans have changed their noise analysis and
  mitigation requirements to be more protective; and the FHWA visual
  assessment guidelines were overhauled in late 2009 (post 2009 FSEIS), and
  amended in 2015. These post-2009 regulatory changes are set out in Sections 8
  and 9 of *Attachment H, Table of Significant Changes.*

- Additional areas of hazardous materials and contaminated soils have been
  identified in the project area and ROW. New 2015 and 2017 soil management
  plans have been devised for the contaminated soils of the Champlain
  Parkway project, along with new Vermont state contaminated waste
  regulations in 2017. Construction impacts have been changed, as have design
  elements of the project. Last but not least, Champlain Parkway cost
  projections have skyrocketed. These changes are detailed in Sections 10, 11
  and 12 of *Attachment H, Table of Significant Changes.*

7.     Many of these changes have occurred on interrelated and synergistic

levels, underscoring their substantiality. For example, the Champlain Parkway project

will transform some intersections in the project from functional levels of service

("LOS") A or B to LOS F; the traffic delays contribute to climate change and also to

unsafe roadway conditions particularly for pedestrians and bicycles.

8.     The 2021 LS FSEIS was strictly limited to review of Environmental Justice

concerns and did not address or take the requisite "hard look" at the changes on the

ground, in public policy and scientific knowledge, and in regulation and statute,

occurring since 2009. The 2021 LS FSEIS did not alter the fact that the 2009 FSEIS is legally stale and functionally obsolete.

9.      Since the 2009 FSEIS, policy and regulatory changes have occurred that require far more robust outreach and review of environmental justice concerns, while at the same time, current demographic data demonstrates that minority and low income populations in the project corridor have risen during this same time period. The 2021 LS FSEIS did not fulfill the government agency's statutory, regulatory and policy obligations to conduct meaningful outreach and assessment of the project's impact on minority and low income populations.

10.     By failing to take into consideration these numerous changes in a public NEPA process, the Defendants' continued reliance on the 2009 FSEIS, even taking into consideration the 2021 LS FSEIS, does not fulfill the NEPA mandate to take the requisite "hard look" at the impacts of the proposed project on the natural and human environment, and further violates regulatory requirements regarding preparation of a Supplemental EIS; Defendants' determination to continue with the project in the absence of a new full, not limited scope, Supplemental EIS is unreasonable, arbitrary and capricious.

11.     Pine Street Coalition also challenges Defendant's determination to proceed with the obsolete Champlain Parkway project under the Endangered Species Act, 16 U.S.C. §1531 et seq.

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 8 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 8 of 60

## JURISDICTION AND VENUE

12.     This case arises under NEPA, 42 U.S.C. §§ 4321 et seq., and the APA, 5

U.S.C. §§ 701-706. This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. §§ 2201-2202

(declaratory judgment), and 5 U.S.C. §§ 701-706 (APA).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the

proposed route for the Champlain Parkway runs through the City of Burlington in the

State of Vermont. Therefore, a substantial part of the events or omissions giving rise to

the claim occurred in this district and a substantial part of the property that is the

subject of this action is situated in this district. In addition, Plaintiffs and two of the

Defendants all reside in this district.

14.     This Court has authority to issue the requested declaratory and injunctive

relief pursuant to 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 705-706. Injunctive relief is

authorized by Rule 65 of the Federal Rules of Civil Procedure.

15.     The requested relief would redress the actual, concrete injuries to

Plaintiffs caused by the failure to comply with duties mandated by the APA, NEPA and

its implementing regulations.

16.     The challenged agency actions are final and subject to judicial review

pursuant to 5 U.S.C. §§ 702, 704, and 706.

## PARTIES and STANDING

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 9 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 9 of 60

17.    The Friends of Pine Street, d/b/a the Pine Street Coalition, is a Vermont

low profit LLC citizens organization.

18.    Members of the Friends of Pine Street d/b/a Pine Street Coalition live

throughout Burlington including within one block of the Champlain Parkway right-of-

way; its members work, travel, socialize, attend business and community meetings and

events, and engage in recreation including walking, biking and observing wildlife

within the Champlain Parkway right-of-way and project corridor, and on properties

abutting the right-of-way and project corridor, including doing so on foot, bicycle and

by public and private transportation. Its mission statement is as follows:

> *The mission of the Pine Street Coalition is re-design of the Champlain Parkway by re-opening a new EIS process in order to incorporate "best practices" of today which include: (1) re-directing the "purpose and need" to meeting the needs of the South End neighborhood and away from facilitating the movement of cars to downtown: (2) reducing instead of increasing the number of roadway injuries to residents and visitors; (3) decreasing the environmental impacts, particularly in regard to the stressed Englesby Brook; (4) provision of separate and equal facilities for those who walk and bike along the corridor; and (5) utilize modern roundabouts to reduce injury rates to all users, cut global warming emissions and other pollutants, reduce gasoline use, reduce delay for all users, manage speeds and thereby reduce noise levels and add scenic quality.*

19.    The Pine Street Coalition brings this action on its own organizational

behalf and on behalf of its members, many of whom regularly enjoy and will continue

to enjoy recreational, and business activities regarding the use and effects of the

Champlain Parkway.

20.    The Pine Street Coalition and its members would be directly and

personally affected and suffer injury-in-fact should Defendants proceed with the

Champlain Parkway project without supplemental or revised NEPA review. Such

harms include demonstrably increased risk of injury as pedestrians and bicyclists

traveling through the Champlain Parkway corridor, where that highway design is

obsolete and does not comply with current statutes, regulations and guidelines

regarding vehicular, pedestrian and bicycle transportation; loss of recreational

opportunities and opportunities to interact with natural resources and view wildlife,

due to the culverting of Englesby Brook and harms to Englesby Brook, Potash Brook,

their related floodplains, wetlands, and Lake Champlain through failure to abide by

current wetland, stormwater and floodplain regulation; and diminishment of visual and

cultural values and characteristics of the community in which they live, work and

recreate along the Champlain Parkway corridor by Defendant's failure to engage in

required visual impact and environmental justice analysis.

21.     Additionally, Plaintiffs would suffer the harm of living and interacting

with the project which had been developed in contravention of the procedural

requirements of NEPA, specifically the requirement to supplement an EIS when

substantial changes have occurred.

22.     Plaintiffs have standing to assert their claims and, to the extent required,

have exhausted all applicable administrative remedies. The requested injunctive and

declaratory relief would prevent or redress the injuries-in-fact to Plaintiff organization

and its members by ensuring compliance with NEPA and the APA.

23.     Defendant THOMAS D. EVERETT is Executive Director of the Federal

Highway Administration ("FHWA"), and is named solely in that official capacity.

Case 5:19-cv-00095-gwc Document 25 Filed 05/16/22 Page 11 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 11 of 60

FHWA is the responsible agency for the Champlain Parkway; in his official capacity, THOMAS D. EVERETT or his subordinates are responsible for deciding whether to initiate and proceed with the Champlain Parkway project, and must ensure that the FHWA and the Champlain Parkway project comply with NEPA and the APA, among other federal and state statutes and regulations.

24.    Defendant JOE FLYNN is Secretary of the State of Vermont Agency of Transportation ("VTrans"), and is named solely in that official capacity. VTrans is, together with the City of Burlington, the project applicant, and, in cooperation with the City of Burlington, is responsible for preparation of the NEPA environmental review documents; in his official capacity, JOE FLYNN or his subordinates are responsible for deciding whether to initiate and proceed with the Champlain Parkway project, and must ensure that the VTrans and the Champlain Parkway project comply with NEPA and the APA, among other federal and state statutes and regulations.

25.    Defendant MIRO WEINBERGER is Mayor and thus the chief executive officer of the City of Burlington ("City"), a Vermont municipal corporation, and is named solely in that official capacity. The City is, together with VTrans, the project applicant, and responsible for preparation of the NEPA environmental review documents; in his official capacity, MIRO WEINBERGER or his subordinates are responsible for deciding whether to initiate and proceed with the Champlain Parkway project, and must ensure that the City and the Champlain Parkway project comply with NEPA and the APA, among other federal and state statutes and regulations.

## STATUTORY AND REGULATORY BACKGROUND

### The National Environmental Policy Act (NEPA)

26.    The National Environmental Policy Act (NEPA) is our "basic national charter for protection of the environment." *40 C.F.R. § 1500.1(a).* Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." *42 U.S.C. § 4321.*

27.    NEPA's goal is to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *40 C.F.R. § 1500.1(b), (c).* When the government acts in violation of its NEPA obligations, courts may enjoin the project construction until the parties comply with NEPA.

28.    The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. *42 U.S.C. § 4342.* CEQ has promulgated general regulations implementing NEPA. *40 C.F.R. §§ 1500-1508.* FHWA's NEPA regulations are found at *23 C.F.R. Part 771.*

29.    NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." *42 U.S.C. § 4332(2)(C).* This statement—commonly known as an environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. *Id. § 4332(2)(C)(i), (ii).* The EIS is an "action-forcing device" that

ensures NEPA's goals "are infused into the ongoing programs and actions" of the

federal government. *40 C.F.R. § 1502.1.*

30.     An EIS must include a "full and fair discussion" of the "direct," "indirect,"

and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate

adverse environmental impacts." *Id. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c).* Direct

impacts are "caused by the action and occur at the same time and place." *Id. § 1508.8(a).*

Indirect impacts are "caused by the action and are later in time or farther removed in

distance, but are still reasonably foreseeable." *Id. § 1508.8(b).* Cumulative impacts are

the "incremental impact[s] of the action when added to other past, present, and

reasonably foreseeable future actions regardless of what agency (Federal or non-

Federal) or person undertakes such other actions." *Id. § 1508.7.* Cumulative impacts

"can result from individually minor but collectively significant actions taking place over

a period of time." *Id.*

31.     Agencies must include analysis of any "connected" actions in the same

EIS. *Id. § 1508.25(a)(1).* Connected actions are those that "automatically trigger other

actions which may require environmental impact statements," "[c]annot or will not

proceed unless other actions are taken previously or simultaneously," or "[a]re

interdependent parts of a larger action and depend on the larger action for their

justification." *Id.*

32.     The EIS must also inform federal agency decision-makers and the public

of the "reasonable alternatives" that would "avoid or minimize adverse impacts or

enhance the quality of the human environment." *Id. § 1502.1.* This analysis of

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 14 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 14 of 60

alternatives is the "heart" of the EIS—i.e., where the agency should "present the
environmental impacts of the proposal and the alternatives in comparative form, thus
sharply defining the issues and providing a clear basis for choice among options." *Id. §
1502.14.* The EIS must "[r]igorously explore and objectively evaluate all reasonable
alternatives," including the alternative of "no action." *Id. § 1502.14(a), (d). 37.*

33.     An EIS must also "specify the underlying purpose and need to which the
agency is responding" in proposing the action the EIS describes and the alternatives the
EIS identifies. *Id. § 1502.13.*

34.     Any federal agency considering approving an activity that may
significantly affect the environment must first prepare a draft EIS. The agency must
make diligent efforts to involve the public in preparing and implementing NEPA
review. *Id. § 1506.6.* The agency must solicit comments from the public, any other
federal agency that has jurisdiction or special expertise on the subject matter, and
Indian Tribes when the project may affect a reservation. See *Id. §§ 1502.9(a), 1503.1(a).*
The agency must then prepare a final EIS based on its consideration of those comments.
*Id. §§ 1502.9(b), 1503.4(a).* The agency must respond to comments by either making
changes to the EIS or explaining why the comments do not warrant further agency
response. *Id. §§ 1502.9(b), 1503.4(a).* At the conclusion of the EIS process, an agency must
issue a record of decision pursuant to *40 C.F.R. § 1505.2.*

35.     If, after the EIS is prepared, the agency makes substantial changes in the
proposed action that are relevant to environmental concerns, or there are significant
new circumstances or information relevant to environmental concerns and bearing on

the proposed action or its impacts, the agency **must** prepare a supplemental EIS. *Id. §*
*1502.9(c)(1)*. A supplemental EIS must be prepared and distributed in the same way as
the draft EIS and final EIS. *Id. § 1502.9(c)(4)*.

36.     The CEQ has established a "rule of thumb" of five years for an EIS to be
"stale'"and require a supplemental EIS. In its *Forty Most Asked Questions Concerning*
*CEQ's NEPA Regulations, 10836 Federal Register Vol. 46 No. 55,* to question #32, "Under
what circumstances do old EISs have to be supplemented before taking action on a
proposal?" the CEQ responds: "As a rule of thumb, if the proposal has not yet been
implemented ... EISs that are more than five years old should be carefully reexamined to
determine if the criteria in Section 1502.9 compel preparation of an EIS supplement. If
an agency has made a substantial change in a proposed action that is relevant to
environmental concerns, or if there are significant new circumstances or information
relevant to environmental concerns and bearing on the proposed action or its impacts, a
supplemental EIS must be prepared for an old EIS so that the agency has the best
possible information to make any necessary substantive changes in its decision
regarding the proposal."

37.     FHWA NEPA implementation regulations mandate a written
Reevaluation to be done for the purposes of determining whether a supplemental EIS or
new EIS is required where a final EIS is not issued within three years of the issuance of
a draft EIS, *23 CFR §771.129(a),* or where major steps to advance the project have not
occurred within three years of issuance of the final EIS, *23 CFR §771.129(b).* After
approval of a ROD, the applicant is required to consult with the agency to determine if

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 16 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 16 of 60

the final NEPA document remains valid prior to proceeding with major steps in the development of the project. *23 CFR §771.129(c)*. The Infrastructure Investment and Jobs Act, PL 117-58 Section 11301, seeks to avoid staleness by stating that the EIS process for major FHWA actions should take an average of 2 years, with authorizations to proceed issuing 90 days after environmental review is done. In the present case, it took Defendants more than 2 years to do the narrow 2021 LS SEIS after they advised the Court and Plaintiffs that it would take 90 days (ECF 5 at p.6) — and that process did not start until 10 years after the 2009 FSEIS was completed.

38.     FHWA NEPA implementation regulations mandate that a supplemental EIS shall be prepared when changes to the proposed action would result in significant impacts that were not evaluated in the EIS, *23 CFR §771.130(a)(1)*; or where new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS. *23 CFR §771.130(a)(2)*.  When the agency is uncertain of the significance of new impacts, the applicant is required to develop appropriate environmental studies or an Environmental Assessment ("EA"), from which the agency will determine whether to prepare a supplemental EIS. *23 CFR §771.130(b)(3)*.

## The Administrative Procedure Act (APA): Standard of Review

39.     The Administrative Procedure Act ("APA") governs judicial review of federal agencies' and officials' compliance with NEPA. Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *5 U.S.C. §706(2)*, and "compel agency action unlawfully withheld or unreasonably delayed," *Id. §706(1)*, or made " without observance of procedure required by law." *5 U.S.C.A. §§ 706(2)(A), (D)*, *Senville v. Peters*, 327 F. Supp. 2d 335, 344 (D. Vt. 2004)

40.     Although a "court may not substitute its judgment for that of the agency, an agency decision may be set aside where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important part of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Senville v. Peters*, 327 F. Supp. 2d 335, 344 (D. Vt. 2004)

41.     Review of an agency's decision not to supplement an EIS is controlled by the arbitrary and capricious standard of *§706(2)(A)*. In the Second Circuit, this review has two steps. First, the court considers "whether the agency took a "hard look" at the possible effects of the proposed action." Second, if the court is satisfied that the agency took a hard look, the court must determine "whether the agency's decision was arbitrary or capricious." *Id.* Courts will not automatically defer to the agency "without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance or lack of significance of the new information". *Senville v. Peters*, 327 F. Supp. 2d 335, 344 (D. Vt. 2004)

**Endangered Species Act**

42.     Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et

seq., in 1973 to affirm our nation's commitment to the conservation of threatened and

endangered species and their habitat – the forests, rangeland, prairies, rivers, and seas

these species need to survive. Congress specifically gave "conservation" a sweeping

definition – the use of all methods and procedures necessary to recover threatened and

endangered species so that they no longer need the Act's protections. 16 U.S.C. §

1532(3). The ESA works, in part, by placing the survival and recovery of imperiled

animals, fish, and plants at the forefront of every federal action and decision.

## FACTS

43.     The Champlain Parkway project is a proposed transportation project in

Burlington, Vermont. Planning for this project began in 1965.

44.     The Champlain Parkway project, if built, would reassign north-south

vehicular access between I-189/Route 7-Shelburne Road and Lakeside Avenue to a

newly constructed limited-access roadway, while dead-ending numerous local streets

including the southerly end of the present predominant north-south route of Pine

Street. *See Attachment A, Champlain Parkway southern portion.* Once the newly constructed

roadway reached Lakeside, the nominal Champlain Parkway would then comprise

modifications in the roadway and signalization for Lakeside Avenue and Pine Street to

Main Street. *See Attachment B, Champlain Parkway northern portion.* In other words, the

southerly portion of the project will move traffic one block westward to a new roadway

until it reaches Lakeside, then will return all traffic to the presently existing City streets

of Lakeside and Pine Street.

45.    In 1979, a Final Environmental Impact Statement (FEIS) was approved and a Selected Alternative chosen for the Champlain Parkway. That project began where I-189 meets Shelburne Street (U.S. Route 7), north and west to the intersection of Battery and Main Streets, in the City Center District, and comprised three sections: C-1, C-2 and C-8. At that time, FHWA's NEPA regulations did not require a Record of Decision ("ROD").

46.    One section of the project as described in the 1979 FEIS was built in the 1980s, but has never been opened to vehicles (the C-1 section, locally known as the "road to nowhere" and used as a recreational space by the community). A new bicycle path adjacent to the C-1 Section is in use, although not completed. The C-2 Section was previously designed to a four-lane cross-section. The C-8 Section was proposed to run through a hazardous waste Superfund Site which was identified after the 1979 FEIS. This is known as the Pine Street Barge Canal Site. The Pine Street Barge Canal Site was designated a Superfund Site by the US Environmental Protection Agency ("EPA") after the Champlain Parkway project Selected Alternative had been approved. This finding delayed project construction significantly.

47.    VTrans determined that despite a Superfund site blocking the planned route, the project should go forward anyway. A Draft Supplemental EIS (DSEIS) was circulated in 1984 proposing construction of the Champlain Parkway through the contaminated wetland Barge Canal site. The 1984 DSEIS never advanced to the final stage or to a decision when issues regarding building in the Superfund Site went unresolved.

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 20 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 20 of 60

48.     An Environmental Evaluation was prepared  by FHWA in 1989

considering a temporary detour around the Barge Canal. Another Supplemental EIS

was approved in February 1997 ("1997 SEIS")proposing an "interim"route around the

Superfund site. The word "interim" was explained in the document as "for the purpose

of improving traffic and safety for a 5 to 10 year period, versus the 20 year design

period used for the alternative selected in the 1979 FEIS." *1997 SEIS p. ES1,2.* This 1997

SEIS proposes the Battery Street extension – the alignment which became Build

Alternative 1 and is now being developed as the Railyard Enterprise Project.

49.     The 1997 SEIS recognized the Maple-King neighborhood as part of a

federally-recognized Enterprise Community due to its pervasive poverty, high

unemployment and general distress. *1997 SEIS p. ES14.* By following the Battery Street

Extension alignment, this FEIS did not anticipate negative impacts on the Enterprise

Community.

50.     The 1997 SEIS specifically rejected the use of existing City streets for the

north end of the project. The 1997 SEIS states that the purpose of the Champlain

Parkway, in addition to improving access" from I 189 and Route 7 to downtown

Burlington, was

> "to eliminate the disruption to local neighborhoods and separate
> the local and through-traffic. The proposed transportation corridor
> is expected to become the major routing for through-traffic in the
> area. The reassignment of the majority of through-traffic to this
> route will reduce traffic volume levels along neighborhood streets,
> and improve accessibility to adjacent neighborhood areas." *1997
> SEIS p. 1-9, 1-10.*

51.     Accordingly, the 1997 FEIS outright rejected using existing streets, rather

than constructing the Battery Street Extension through the Railyard, stating:

> "Other alternatives that were also analyzed included: 1) an existing
> streets alternative which utilized existing streets at the north end of
> the project such as Maple Street, King Street, and Main Street; this
> alternative was dropped due to objections from the City of
> Burlington, regarding traffic flowing through residential areas, and
> 2) a widening of Lakeside Avenue which would route traffic onto
> Pine Street from the connector utilizing Lakeside Avenue. This
> second alternative would only be effective with a major widening
> of Pine Street. Such a widening (i.e. resulting in a 4-land section)
> was not considered acceptable from the standpoint of
> environmental impacts and local acceptability." *1997 SEIS p. 2-15.*

52.     The ROD for the 1997 SEIS adopted Alternative 1, the Battery Street

Extension alignment, to serve its intended function of providing traffic relief to the

neighborhoods "until such time as the Superfund Site is made suitable for completion

of the highway, as originally approved." *1979 ROD p. 1.*

53.     Despite the selection of a final preferred alternative in the 1997 ROD, the

Defendant agencies once again did not proceed to construction.

54.     Meanwhile, through the 1980s and 1990s, the State and EPA engaged in a

series of actions aimed at emergency stabilization and amelioration of the Barge Canal

Superfund Site. Containment efforts at the Barge Canal are ongoing, including

extensions of the cap at the southern end of the canal (towards Lakeside Avenue), and

attempts to address benzene extending into groundwater and coal tar appearing in

monitoring wells. The status of the Barge Canal site is documented by the EPA on its Superfund Site webpage.[1]

55.   In March, 2002, the City decided to resurrect and modify the project. Specifically, the road-to-nowhere section (built in the 1980s) would be reduced from a four-lane roadway to a two-lane roadway. The City and VTrans also agreed to formally abandon the C-8 Section through the Pine Street Barge Canal Superfund Site, and designate the C-1 Section, C-2 Section and C-6 Section as the permanent alignment for the Champlain Parkway.

56.   In 2003, the City, VTrans and FHWA initiated a new FSEIS addressing the modifications of the project.

57.   In 2005, VTrans recommended further changes, reducing the project to Sections C-1 and C-2, with the C-6 section transformed to comprise modifications to the existing City streets of Lakeside and Pine Street.

58.   In 2006, about ten years after the last EIS, the City, VTrans and FHWA circulated a Draft Supplemental EIS. A public hearing was held during the review period for the 2006 DSEIS. This was the last public hearing held on the Champlain Parkway relative to the NEPA process (excluding the hearing on the 2021 LS FSEIS, which was strictly limited to a narrow range of issues relative to environmental justice impacts on one small section of the project area). Members of the Pine Street Coalition attended and commented at this 2006 public hearing.

---

[1] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0101479#Status

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 23 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 23 of 60

59.     It took the Defendant government agencies another three years after the

public hearing to release the 2009 FSEIS, which was distributed for public and agency

review on September 24, 2009. In January, 2010, the Federal Highway Administration

identified the Pine Street alignment – Build Alternative 2 – as the Selected Alternative

for the Champlain Parkway with the issuance of the ROD.

60.     For another eight years after the January 2010 ROD, the Defendant

government agencies again did not advance the Champlain Parkway project to

construction.

61.     Prior to adoption of the 2009 FSEIS and its switch, for the first time, to the

Pine Street alignment for the northern end of the project, there had not been organized

opposition to the project, and delays were due to government inaction. After the Pine

Street alignment was adopted, the project was opposed by a number of parties, and

litigation occurred regarding the wetland, stormwater and state Act 250 (Vermont's

state land use regulation program) permits.

62.     From 2009 to 2018, a series of design changes was made on the project,

including changes to sidewalks and railroad crossings, and Burlington's South End

experienced significant vibrant growth, becoming the City's cultural center.

63.     In April 2018, the Pine Street Coalition delivered to the Defendants a

demand letter packet, detailing through an extensive memoranda a wide array of

statutory, regulatory, and policy changes that had occurred relative to the Champlain

Parkway project and its impacts since the 2009 FSEIS, including the "sea change" in

federal and state highway law and policy to emphasize safety (a word which appears

only ten times in the 2009 FSEIS, and each of those times only in passing rather than as a focus of discussion), non-motorized travel, and environmental justice.

64.    The Pine Street Coalition demand letter packet further informed Defendants, through a detailed photographic inventory, of the extensive changes on the ground which had occurred in the Champlain Parkway corridor since the 2009 FSEIS.

65.    The Pine Street Coalition demand letter packet also raised the point that the Defendants had initiated progress on the Railyard Enterprise Project, a roadway project which duplicates the Battery Street alignment – the Build Alternative 1 which was rejected in the 2009 FSEIS/2010 ROD. In 2016, an initial scoping/FHWA Planning and Environmental Linkages ("PEL") study had been completed on the Railyard Enterprise Project.

66.    Noting that public comment had not been solicited since 2006, and that the affected community had long since experienced dramatic change, the Pine Street Coalition demanded that Defendants engage in fresh NEPA review to ensure that agency decision-making regarding the Champlain Parkway was informed by current information, public comments from the present affected community, and review accounting for present laws, policies, data and methodologies.

67.    Defendants did not provide any substantive response to the Pine Street Coalition's communication. Instead, they stated that these comments would be considered during internal Reevaluation.

68.    On May 7, 2019, Defendant FHWA provided to Pine Street Coalition

in response to a public records request) a copy of a March 2019 Reevaluation document prepared by a consulting firm for FHWA, VTrans and the City. It was accompanied by a cover letter from VTrans to FHWA seeking FHWA concurrence, dated May 2, 2019. FHWA signed off on the Reevaluation on May 6, 2019.

69. The Reevaluation document does not make any mention whatsoever of the demand letter packet or information provided to Defendants by the Pine Street Coalition, and does not respond in any way to the Pine Street Coalition's concerns and documentation of changes since the 2009 FSEIS.

70. The Reevaluation was conducted with no public notice, public outreach or public comment (other than the unsolicited packet presented by Pine Street Coalition). The Reevaluation document was not publicly published.

71. The Reevaluation acknowledges some changes that have occurred in the project design as well as a few on-the-ground and regulatory changes that have occurred since 2009 but makes no mention whatsoever of numerous other statutory, regulatory, policy, data, methodology, and on-the-ground changes. The Reevaluation also mischaracterizes several of the changes it addresses.

72. In June 2019, in the face of Defendants' determination to proceed with the Champlain Parkway project ten years after the close of NEPA review, the Pine Street Coalition initiated this legal action, asserting that the 2009 FSEIS was stale, and that environmental justice review had not been undertaken in accordance with law.

73. Promptly thereafter, FHWA initiated Voluntary Remand of this action for the limited purposes of conducting Environmental Justice review. In the Voluntary

Remand filing, FHWA represented to this court and the other parties that they
anticipated requiring 90 days to complete the Environmental Justice review. (ECF 5 at p.
6.) FHWA also represented that the parties were aware that the Voluntary Remand
would only address the Environmental Justice claims in Plaintiff's Complaint, and that
the other issues remained to be litigated after the Voluntary Remand was complete. *Id.*

74.     FHWA rescinded their 2010 ROD in October, 2019.

75.     In 2020, the Chittenden County Regional Planning Commission, through
US DOT/FHWA funding, completed supplemental scoping/FHWA PEL Study on the
Railyard Enterprise Project.[2] The City engaged a consultant, RSG, to advance the
project.[3] In May 2021, the City and VTrans signed a cooperation agreement to advance
the Railyard Enterprise Project. In August 2021, the City released a South End
Construction Coordination Plan memo showing the simultaneous construction of the
Champlain Parkway Pine Street Alignment (Build Alternative 2) and the Railyard
Enterprise Project (Build Alternative 1).

76.     In September 2021, well over two years after taking Voluntary Remand,
Defendants released the 2021 LS FSEIS limited to Environmental Justice impacts, and
issued a new ROD on January 20, 2022. This Court was notified on February 1, 2022,
that the Voluntary Remand was complete.

77.     The 2022 ROD effectively reiterates the 2010 ROD. Other than conducting
limited outreach to a narrowly-identified Environmental Justice community (and doing

---

[2] https://www.ccrpcvt.org/our-work/transportation/current-projects/scoping/railyard-enterprise-project/
[3] https://rsginc.com/project/burlington-railyard-enterprise-project/

so inadequately, as detailed below), the 2021 LS FSEIS and 2022 ROD do not address the

changes on the ground, or the changes in policy, scientific knowledge, regulation and

statute, which have occurred since 2009 related to the project's environmental impacts,

and do not address the cumulative impacts of constructing both Build Alternatives.

## CAUSES OF ACTION

### COUNT I:
### VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES AND THE APA: CONNECTED ACTIONS, SIMILAR ACTIONS

78.      Plaintiffs repeat and reallege paragraphs 1 through 77 above as though
more fully recounted herein.

79.      By failing to analyze and consider the environmental consequences and

impacts of connected actions in their 2019 Reevaluation and in their 2021 LS FSEIS,

including but not limited to the Railyard Enterprise Project (funded by FHWA) and the

Main Street Great Streets Project, occurring within the Champlain Parkway project area,

which physically intersect with the Champlain Parkway, and address the same

purposes and needs as the Champlain Parkway, including reassignment of traffic

within the Maple-King neighborhood and throughout Burlington's South End,

Defendants have failed to fulfill their NEPA mandate to consider the impacts of

connected actions and similar actions.

80.      Actions are "connected" for purposes of NEPA review when they:

> (i) Automatically trigger other actions which may require
> environmental impact statements.
> (ii) Cannot or will not proceed unless other actions are taken
> previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the
> larger action for their justification.

*40 C.F.R. 1508.25(a)(1).*

"Similar" actions, for purposes of NEPA review are those:

> which when viewed with other reasonably foreseeable or proposed
> agency actions, have similarities that provide a basis for evaluating
> their environmental consequences together, such as common
> timing or geography. An agency may wish to analyze these actions
> in the same impact statement. It should do so when the best way to
> assess adequately the combined impacts of similar actions or
> reasonable alternatives to such actions is to treat them in a single
> impact statement.

*40 C.F.R. 1508.25(a)(3).*

81.     In the present case, according to the NEPA scoping documents for the
Railyard Enterprise Project (henceforth, REP) prepared by the Chittenden County
Regional Planning Commission and funded by FHWA, the Champlain Parkway and
the REP are physically intertwined; they intersect where the REP roadway meets Pine
Street, resulting in the need for a newly constructed intersection.  The projects are thus
interdependent: Defendants cannot build one type of intersection on Pine Street for the
Champlain Parkway, while simultaneously occupying that same intersection with a
different construction configuration for the Railyard Enterprise Project.

82.     The configuration or signalization of this REP/Champlain Parkway
intersection, and the impact of the REP on traffic north of that intersection along Pine
Street through the Maple King neighborhood, alters and belies the relevancy of the
traffic data used in the Champlain Parkway NEPA process to justify construction of the
Pine Street segment of the Champlain Parkway through the Maple King neighborhood.

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 29 of 60

Defendants are well aware that the traffic flow, volumes and patterns in the Maple King neighborhood will change with the pending construction of the REP.

83.     Similarly, the Main Street Great Streets project physically intersects with the Champlain Parkway at the intersection of Main Street and Pine Street, and will alter traffic flow, volumes and patterns at this northern terminus of the Champlain Parkway project.

84.     In an August 9, 2021 memorandum, and numerous other documents of the City of Burlington, the Burlington Director of Public Works describes the Champlain Parkway, REP, Main Street Great Streets project, and other pending infrastructure projects in Burlington's South End as comprising the South End Construction Coordination Plan, consisting of a "confluence of capital projects in the area that must be carefully coordinated so as to limit impacts...". The timeflow chart contained within that memo demonstrates the coordinated, overlapping construction sequence of the Champlain Parkway, REP and Main Street Great Streets projects. Documents of the City and VTrans reflect that the REP is an active, ongoing endeavor:

- VTrans maintains a Project Fact Sheet on the REP reflecting a plan for construction in 2025 https://resources.vtrans.vermont.gov/FactSheet/default.aspx?pin=21D044
- The City voted in December 2020 to proceed to engineering for the REP. https://www.burlingtonvt.gov/Press/Railyard-Enterprise-Project-Advancing-to-Preliminary-Engineering
- The City and State of Vermont signed a cooperation agreement for development of the REP in May, 2021; the minutes of the Burlington City Council meeting of May 24, 2021 also reflect that the majority of funding for the REP is federal.
- The City issued Requests for Qualifications for REP design in the Summer of 2021; the request specifically looks for professionals to

work through the NEPA process for the REP.
https://www.burlingtonvt.gov/sites/default/files/RFQ_REP%20
PE_062221.pdf
• The City engaged Stantec to manage the REP project development;
  Stantec has launched the project website, is soliciting public
  comments, and is engaged in environmental assessment
  development. https://engagestantec.mysocialpinpoint.com/rep

85.   The fact that the South End Construction Coordination Plan specifies that
the Main Street Great Streets Project, Champlain Parkway, and REP are to be built at the
same time demonstrates the interdependence and similarity of these projects. The 2009
FSEIS and 2021 LS FSEIS show the intersections of the Champlain Parkway with the
REP and Main Street as being constructed as if those other projects did not exist, and
make all assumptions and predictions regarding traffic at those intersections
accordingly. *See Attachment B, Images of Champlain Parkway South and North Segments
from champlainparkway.gov, and Attachment D, REP Intersection with Pine Street.* Yet clearly
Defendants do not intend to build those intersections in the configurations shown in the
Champlain Parkway NEPA documents; they intend to build the intersections as shown
in the REP and Main Street Great Streets plans. At these intersections, and in their
impacts on traffic flow, volume, and patterns, these projects are interdependent.

86.   The purpose of the REP is to "reduce traffic in the neighborhoods that
border the blocks of Pine Street south of Main Street," that is, the Maple-King
neighborhood (https://www.burlingtonvt.gov/Press/Railyard-Enterprise-Project-
Advancing-to-Preliminary-Engineering), one of the same purposes as the Champlain
Parkway; so the REP and Champlain Parkway are each addressing the same traffic

concerns in the same neighborhood. Without assessing the cumulative impacts of these two projects, the Defendants cannot know or share with the public whether both projects are necessary; cannot know whether the traffic-reducing impact of the REP will obviate the need for the Champlain Parkway or eliminate the need for signalization in the Maple-King neighborhood; and have foreclosed the opportunity to look at omnibus alternatives, like making each route a one-way road that would reduce tarmac and increase safety to pedestrians and bicyclists.

87. The Champlain Parkway, REP, and Main Street Great Streets projects comprise interdependent, physically interlinked parts of a larger action, the South End Construction Coordination Plan. They occupy the same geography and their construction timing is proposed to be simultaneous. Defendants' failure to consider these connected and similar actions in a single NEPA process is arbitrary, capricious, unreasonable, in violation of NEPA and its implementing regulations, contrary to the APA.

88. Unless and until Defendants prepare NEPA-compliant documents and provide for public comment on those documents, Plaintiff and its members will be irreparably harmed. The relief Plaintiff seeks will redress these injuries by requiring Defendants to comply with NEPA and the APA.

## COUNT II:
## VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES AND THE APA: FAILURE TO CONSIDER CUMULATIVE and INDIRECT IMPACTS

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 32 of 60

89.     Plaintiffs repeat and reallege paragraphs 1 through 88 above as though more fully recounted herein.

90.     By failing to analyze and consider, in their 2019 Reevaluation and 2021 LS FSEIS, the cumulative and indirect environmental consequences and impacts of actions, including but not limited to the FHWA-funded REP and the Main Street Great Streets Project, occurring within the Champlain Parkway project area, which physically intersect with the Champlain Parkway, and address the same purposes and needs as the Champlain Parkway, including reassignment of traffic within the Maple-King neighborhood and throughout Burlington's South End, Defendants have failed to fulfill their NEPA mandate to consider the cumulative and indirect impacts of federal actions.

91.     A "cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions." *40 C.F.R. § 1508.7.*

92.     In conducting NEPA analysis of cumulative impacts, the responsible agency:

must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions — past, present, and proposed, and reasonably foreseeable — that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C.Cir.2002).

93.     In the present case, scoping documents for the REP have been prepared by the Chittenden County Regional Planning Commission and funded by FHWA, and the City has completed design for the Main Street Great Streets Project. As described above, these projects occupy the same project area as the Champlain Parkway project, are scheduled by the City for simultaneous construction as part of the South End Construction Coordination Plan, and directly affect traffic flow, volume and patterns on the same streets. At their intersections, these projects occupy the exact same footprint on the ground. These projects are accordingly in the same area, proposed and reasonably foreseeable, and have interrelated impacts.

94.     The 2009 FSEIS and 2021 LS FSEIS show the intersections of the Champlain Parkway with the REP and Main Street as being constructed as if those other projects did not exist, and make all assumptions and predictions regarding traffic at those intersections accordingly. That is, the Champlain Parkway is shown as proceeding straight down Pine Street, passing through the segment where the REP will join Pine Street as if the REP is not there and no intersection were planned. The Champlain Parkway intersection with Main Street depicts Main Street in its pre-Great Streets makeover condition.

95.     The 2009 FSEIS examined several alternatives, with a particular focus on Alternative 2 (the currently identified Champlain Parkway preferred) and Alternative 1, which comprised the same diagonal link from Pine Street to Battery Street which is now presented as the REP. *See Attachment E, 2009 FSEIS Map of Alternatives 1 and 2.* The

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 34 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 34 of 60

environmental consequences of both alternatives 1 and 2 were analyzed; Alternative 2,

the Pine Street alignment, was selected, and Alternative 1, the REP alignment, was

rejected. *See Attachments F and G, 2009 FSEIS descriptions of Alternatives 1 and 2.* At that

time, it was not contemplated that the C-6 sections of **both** alternatives might be built.

Therefore, the 2009 FSEIS did not assess the **cumulative** impacts of Alternative 2 and

the C-6 component of Alternative 1 (the present REP).

96.     At the time of the 2009 FSEIS, the NEPA process for the REP had not yet

begun. However, in 2016 and by supplement in 2020, the REP has now been through

two rounds of FHWA-funded scoping. The 2019 Champlain Parkway Reevaluation

document summarily concludes that "the Southern Connector/Champlain Parkway

Project will not result in any attributable cumulative impacts with any of the other past,

present and reasonably foreseeable projects discussed in this section" without making

any analysis whatsoever of those cumulative impacts. The Re-Evaluation points to the

2016 REP Scoping/PEL Report, but that 2016 REP Scoping document specifically states

that it has not analyzed indirect effects and cumulative impacts.

97.     The 2021 LS FSEIS rejected all comments about cumulative and indirect

impacts as being outside the scope of review, despite the importance of those

cumulative impacts to the Maple King community which would be effectively islanded

by the Champlain Parkway, REP, and Main Street projects. *See 2021 LS FSEIS,

Champlain Parkway Summarized Responses to Comments, page 43 of 125.*

98.     One comment response by Defendants states that "the combined impacts

of [Champlain Parkway and the REP] may be assessed as that project progresses." By

this comment responses, Defendants have asserted that the obligation to assess
cumulative impacts can be deferred to a future, later project's NEPA process. *See 2021
LS FSEIS Appendix 7: September 26, 2019 Public Outreach Meeting – Responses to Comments*
pp. 53-56 of 79.  Such a deferral would be contrary to NEPA's purpose, which is to
ensure that decisionmakers have access to information about environmental
consequences at the time a project decision is made.

99.     It is unreasonable to assert that three physically intersecting,
simultaneously proceeding road construction projects in a geographically small
community area of a few blocks--each of which has impacts on sound, safety, aesthetics,
wetlands, recreational opportunities, air quality, the character of the community, and
historical resources — would not result in *any* cumulative impacts.  Without showing
how it reached its conclusion, Defendants' counterintuitive, unsupported determination
that there are *no* cumulative impacts is arbitrary and capricious.

100.     Numerous changes to the Champlain Parkway project, including a new
construction access using Electric Drive and changes to rail crossings, have been
introduced since 2009. These changes have not been subjected to the NEPA process of
review, and Defendants have failed to consider the cumulative impacts of these
changes.

101.     Defendants' failure to consider the indirect effects and cumulative impacts
of proposed and reasonably foreseeable intersecting and overlapping road projects in a
single NEPA process is arbitrary, capricious, unreasonable, in violation of NEPA and its
implementing regulations, contrary to the APA.

102.    Unless and until Defendants prepare NEPA-compliant documents and
provide for public comment on those documents, Plaintiff and its members will be
irreparably harmed.  The relief Plaintiff seeks will redress these injuries by requiring
Defendants to comply with NEPA and the APA.

<div align="center">

**COUNT III:**
**VIOLATION OF NEPA AND ITS IMPLEMENTING REGULATIONS AND**
**POLICIES, AND THE APA: FAILURE TO PREPARE SUPPLEMENTAL EIS**
**IN LIGHT OF MYRIAD CHANGES, NEW INFORMATION**
**and NEW CIRCUMSTANCES**

</div>

103.    Plaintiffs repeat and reallege paragraphs 1 through 102 above as though
more fully recounted herein.

104.    The contents of the *Table of Significant Changes* appended to and
incorporated into this Complaint as *Attachment H* comprise changes to the proposed
action which would result in significant impacts not evaluated in the 2009 FSEIS and
2021 LS FSEIS, *23 CFR §771.130(a)(1);* or comprise new information or circumstances
relevant to environmental concerns and bearing on the proposed action or its impacts
that would result in significant environmental impacts not evaluated in the 2009 FSEIS
and 2021 LS  FSEIS. *23 CFR §771.130(a)(2).*  These changes implicate climate change,
water quality, noise, community character, and public safety among other key
environmental impacts, and include changes on the ground in the project area,
specifically significant economic and physical development; changes to the project itself;
changes in municipal, state and federal planning documents and policies; and changes
in pertinent statutes and regulations.

105.    Defendants have violated NEPA by failing to prepare a supplemental EIS where significant changes have occurred related to the project and affecting environmental concerns since issuance of the 2009 FSEIS, rendering that 2009 FSEIS stale; and further where the 2021 LS FSEIS did not address these significant changes but was strictly limited to a narrow Environmental Justice exercise. Defendants' decision to proceed with the Champlain Parkway project without preparing a supplemental EIS is arbitrary and capricious, an abuse of discretion, and contrary to law, or made without observance of procedure required by law in violation of the APA.

106.    Unless and until Defendants prepare NEPA-compliant documents and provide for public comment on those documents, Plaintiff and its members will be irreparably harmed. The relief Plaintiff seeks will redress these injuries by requiring Defendants to comply with NEPA and the APA.

## COUNT IV:
## VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES AND THE APA: FAILURE TO CONSIDER REASONABLE ALTERNATIVES and the NO-ACTION ALTERNATIVE

107.    Plaintiffs repeat and reallege paragraphs 1 through 106 above as though more fully recounted herein.

108.    NEPA requires consideration of reasonable alternatives, including alternatives which arise in the course of NEPA review.

109.    NEPA requires consideration of the No Action alternative throughout the NEPA process.

Case 5:19-cv-00095-gwc   Document 25   Filed 05/16/22   Page 38 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 38 of 60

110. Defendants have violated NEPA by failing to consider the No Action alternative in their 2019 Reevaluation and in their 2021 LS FSEIS.

111. Defendants have violated NEPA by failing to consider a reasonable alternative presented in comments by the Plaintiff, specifically the "Champlain RIGHTway" proposal, which constitutes a scaled-back, green version of the project, avoiding damage to the Englesby Brook natural area and the forested right-of-way sections, and utilizing the REP/Build Alternative 1 alignment *instead of, not in addition to,* the Pine Street Alignment.

112. Unless and until Defendants prepare NEPA-compliant documents and provide for public comment on those documents, including consideration of the No Action alternative and reasonable alternatives raised by the public in comments, Plaintiff and its members will be irreparably harmed. The relief Plaintiff seeks will redress these injuries by requiring Defendants to comply with NEPA and the APA

## COUNT V:
## VIOLATION OF NEPA AND ITS IMPLEMENTING REGULATIONS AND POLICIES, AND THE APA: FAILURE TO TAKE A "HARD LOOK"

113. Plaintiffs repeat and reallege paragraphs 1 through 112 above as though more fully recounted herein.

114. NEPA and its regulations require that federal agencies take a hard look at the potential environmental impacts of a proposed project.

115. In failing to engage in additional NEPA process, including engaging public comment, conducting analysis, and engaging in due consideration, in light of the

extensive changes in statutes, regulations, policies, information, and circumstances on the ground since 2009, as described in the contents of the *Table of Significant Changes* appended to and incorporated into this Complaint as Attachment H, including but not limited to failure to apply or consider the impacts of Defendants' own new regulations, guidelines and policies pertaining to transportation safety, Defendants have failed to take a hard look at the environmental consequences of the proposed action.

116.    Defendants have violated NEPA by failing to take a hard look at the environmental consequences, impacts of significant changes which have occurred related to the project and affecting environmental concerns, without considering substantial new information which has become available since issuance of the 2009 FSEIS including substantial changes to statutes, regulations, guidelines and policies, rendering that 2009 FSEIS stale. Defendants' decision to proceed with the Champlain Parkway project without taking a hard look at the impact of changes and newly available information is arbitrary and capricious, an abuse of discretion, and contrary to law, or made without observance of procedure required by law in violation of the APA.

117.    Unless and until Defendants prepare NEPA-compliant documents and provide for public comment on those documents, Plaintiff and its members will be irreparably harmed.  The relief Plaintiff seeks will redress these injuries by requiring Defendants to comply with NEPA and the APA.

**COUNT VI:
VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES
AND THE APA: FAILURE TO TAKE A MAKE A REASONED DECISION**

118.    Plaintiffs repeat and reallege paragraphs 1 through 117 above as though more fully recounted herein.

119.    By failing to analyze and consider, in their 2019 Reevaluation and 2021 LS FSEIS, the environmental consequences and impacts of significant changes which have occurred related to the project and affecting environmental concerns, and substantial new information which has become available since issuance of the 2009 FSEIS including substantial changes to statutes, regulations, guidelines and policies, rendering that FSEIS stale, Defendants have failed to make a reasoned decision in proceeding with the Champlain Parkway project without a revised EIS.

120.    By determining to proceed with the Champlain Parkway project without a revised EIS, where information in the agency record runs directly counter to their conclusions, Defendants have failed to make a reasoned decision. For example, by declaring in their Reevaluation that the Champlain Parkway is consistent with municipal planning documents, in the face of a significant number of City planning documents issued since 2009 which run directly counter to or disavow the Champlain Parkway project (as detailed in the attached Table of Significant Changes), Defendants have failed to evince reasonable decision-making.

121.    Defendants have failed to make a reasoned decision in light of substantial new information affecting or affected by the proposed project; failure to make a reasoned decision is arbitrary and capricious an abuse of discretion and otherwise contrary to law, in violation of the APA.

122.    Unless and until Defendants prepare NEPA-compliant documents and
provide for public comment on those documents, Plaintiff and its members will be
irreparably harmed.  The relief Plaintiff seeks will redress these injuries by requiring
Defendants to comply with NEPA and the APA.

## COUNT VII:
## VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES AND THE APA: FAILURE TO ENGAGE IN ENVIRONMENTAL JUSTICE REQUIRED ACTIONS

123.    Plaintiffs repeat and reallege paragraphs 1 through 122 above as though
more fully recounted herein.

124.    As referenced in the Table of Significant Changes appended to and
incorporated into this Complaint, in implementation of Executive Order 12898, "Federal
Actions to Address Environmental Justice in Minority Populations and Low-Income
Populations", high-level cross-agency changes have been developed since 2009,
including within USDOT, the parent agency of FHWA.

125.    The most recent USDOT Environmental Justice order, 5610.2(a) was
published in May of 2012. This Order states, "This will be done by fully considering
environmental justice principles throughout planning and decision-making processes in
the development of programs, policies, and activities, using the principles of the
National Environmental Policy Act of 1969 (NEPA), Title VI of the Civil Rights Act of
1964 (Title VI), the Uniform Relocation Assistance and Real Property Acquisition
Policies Act of 1970, as amended, (URA), the Safe, Accountable, Flexible, Efficient
Transportation Equity Act: A Legacy for Users (Public Law 109-59; SAFETEA-LU) and

other USDOT statutes, regulations and guidance that address or affect infrastructure planning and decision-making; social, economic, or environmental matters; public health; and public involvement."[4] "The updated Order maintains the original Order's general framework and procedures and U.S. DOT's commitment to promoting the principles of environmental justice in all USDOT programs, policies, and activities."[5]

126.    There has been extensive procedural development of Environmental Justice requirements throughout the USDOT Order guidance documents.

127.    In 2015, FHWA published its Environmental Justice Reference Guide intended to encompass all orders and create a place for local authorities to go to ensure compliance with environmental justice goals.[6] This guidance includes the three major principles of environmental justice which are, "(1) To avoid, minimize, or mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects, on minority and low-income populations. (2) To ensure the full and fair participation by all potentially affected communities in the transportation decision making process. (3) To prevent the denial of, reduction in, or significant delay in the receipt of benefits by minority and low-income populations."

128.    This reference guide puts emphasis on public involvement especially in vulnerable areas. This memo also includes an overview of the interceding requirements of Title VI, NEPA, and Executive Order 12898. It then goes on to discuss techniques for

---

[4] https://www.fhwa.dot.gov/environment/environmental_justice/ej_at_dot/orders/order_56102a/

[5] https://www.fhwa.dot.gov/environment/environmental_justice/ej_at_dot/orders/order_56102a/

[6] https://www.fhwa.dot.gov/environment/environmental_justice/publications/reference_guide_2015/fhwahep15035..pdf

crews on the ground to determine areas which will require Environmental Justice

analysis.

129.    The reference guide goes on to discuss more details on how to relate

Environmental Justice to highway safety and specifics, requiring that FHWA officials

"relate Environmental Justice principles to the phases of transportation project

development: planning, environmental review, design, right-of-way (ROW),

construction, and maintenance and operations. This includes a discussion of public

involvement, another important overarching activity."[7]

130.    The 2015 FHWA Environmental Reference Guide mandates that, in areas

vulnerable to environmental justice concerns, the Agency is required to affirmatively

engage in public outreach so that minority and low-income community members are

allowed a voice.

131.    Since 2015, the federal government, and the Federal Department of

Transportation, in which FHWA is nested, have "ramped up" and prioritized

Environmental Justice with a slate of new directives, including:

- FHWA 2016 Environmental Justice Strategy

- DOT Secretary of Transportation March 29, 2021 Equity and Access
  Policy Statement

- Executive Order 13985 of January 20, 2021 Advancing Racial Equity
  and Support for Underserved Communities Through the Federal
  Government

_____

[7]https://www.fhwa.dot.gov/environment/environmental_justice/publications/reference_guide_2015/fhwahep15035..
pdf

- DOT 5610.2C May 14, 2021 SUBJECT: U.S. DEPARTMENT OF TRANSPORTATION ACTIONS TO ADDRESS ENVIRONMENTAL JUSTICE IN MINORITY POPULATIONS AND LOW-INCOME POPULATIONS

- DOT 1000.12C June 11, 2021 SUBJECT: THE U.S. DEPARTMENT OF TRANSPORTATION TITLE VI PROGRAM

These documents re-emphasize the need for FHWA to prioritize Environmental Justice concerns at the planning, design, and decision-making phases of transportation project review including in NEPA processes.

132.    Defendants here have failed to fulfill their Environmental Justice mandates. FHWA took voluntary remand of this matter in 2019 for the purpose of conducting Environmental Justice review, and produced a 2021 LS FSEIS and related ROD. However, in the course of so doing they failed to seek and consider the comments and voices of low-income, Black and Brown communities and community members in the decision-making and planning process:

- The 2021 LS FSEIS process was conducted ten to twelve years after the project was planned and after the preferred alternative was selected, so there was no solicitation of or inclusion of low-income, black and brown input into the planning and decision-making process;
- No alternatives were presented in the course of the 2021 LS FSEIS process, rather the preferred alternative was presented as a "done deal";
- Environmental Justice communities were inaccurately and disingenuously identified, or rather, omitted, including the assertion that there are no "low income" communities in this federal low-income opportunity zone (and where the same neighborhood is defined as "low income" in the REP scoping documents) and including the assertion that a minority population in Census Tract 8 Block Group 1 (outside the Maple King neighborhood) was identified but that outreach to them would occur later (2021 LS DSEIS Executive Summary);

Case 5:19-cv-00095-gwc  Document 25  Filed 05/16/22  Page 45 of 60

Pine Street Coalition v. Everett et al.
Docket 5:19-CV-95
SECOND AMENDED COMPLAINT
Page 45 of 60

- Outreach to the heavily COVID-19 affected black and brown
  community was minimal, occurred during the height of the pandemic
  primarily by online means, at a time when these economically
  constrained households were suffering from high COVID case
  numbers, and their online and computer resources were absorbed by
  working from home and children schooling from home. Defendants
  ignored requests to extend and reopen comment periods.

133.    The cursory, insensitive and inaccurate outreach to environmental justice

communities performed ten to thirteen years after the Champlain Parkway decision has

been made is rendered more egregious in light of the failure to consider cumulative

impacts and connected projects as set out in Counts I and II above. The Champlain

Parkway bisects the Maple King neighborhood – the neighborhood which has the

highest Black and Brown resident population in the State of Vermont. Together, the

Champlain Parkway, Main Street Great Streets project, and REP, form a closed triangle

that wholly surrounds and "islands" the western half of the bifurcated Maple King

neighborhood. Champlain Parkway project 2021 LS FSEIS review outreach completely

omitted mention of these other projects.

134.    Defendants have violated NEPA by failing to fulfill Environmental Justice

mandates put into place by statute, Executive Order, regulations and agency guidance.

Defendants' decision to proceed with the Champlain Parkway project without

compliance with Environmental Justice mandates is arbitrary and capricious, an abuse

of discretion, and contrary to law, or made without observance of procedure required

by law in violation of the APA.

135.    Unless and until Defendants prepare NEPA-compliant documents and

provide for public comment on those documents, Plaintiff and its members will be

irreparably harmed. The relief Plaintiff seeks will redress these injuries by requiring

Defendants to comply with NEPA and the APA.

## COUNT VIII:
## VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES AND THE APA: FAILURE MAKE A REASONED DECISION, TAKE A HARD LOOK, and MEANINGFULLY RESPOND TO COMMENTS RELATIVE TO ENVIRONMENTAL JUSTICE DETERMINATIONS IN 2021 LS FSEIS

136.    Plaintiffs repeat and reallege paragraphs 1 through 135 above as though

more fully recounted herein.

137.    Defendants improperly identified environmental justice populations, in

such a way as to minimize and exclude minority and low-income persons from their

consideration in the 2021 LS FSEIS NEPA process.

138.    FHWA guidelines state that, in determining whether low-income

populations are present for Environmental Justice analysis purposes, state and local

thresholds may be used as long as they are more inclusive than HHS poverty

guidelines. *2015 FHWA EJ Reference Guide*. VTrans, citing to FHWA, also reiterates that

the definition of "low-income" may be based on state or municipal thresholds rather

than the HHS poverty guidelines. VTrans "*FHWA Questions and Answers on*

*Environmental Justice and Title VI".[8]* Despite extensive comments from the Pine Street Coalition, among others, referencing FHWA's, Defendants ignored their own guidelines, and failed to meaningfully respond to these comments, erroneously stating that the HHS poverty line is the only yardstick for "low-income" environmental justice review.

139.    Defendants unreasonably used American Community Survey data, available only on a census-tract-wide basis, to exclude low-income communities in the project area. Defendants failed to meaningfully respond to comments including an expert's letter relative to the insufficiency of the ACS data for Environmental Justice purposes.

140.    Under City and State definitions, the project area is a "low-income" community. Vermont Governor Phil Scott named the area as a Low Income Opportunity Zone, using State of Vermont Agency of Commerce and Community Development guidelines based on US IRS/Treasury Department definitions, following 26 USC §45D(e)(1).

141.    By State and City defitions, all of Census Tract 10, Census Tract 9 Block Groups 2 and 3, and Census Tract 8 Block Group 1 are all "low-income" communities, but were not so identified by Defendants in their Environmental Justice NEPA review.

[8] https://vtrans.vermont.gov/sites/aot/files/civilrights/documents/titlevi/Q%26AonEnvironmental JusticeandTitle%20VI.pdf

142.    In addition to misapplying standards to support their determination that

there are no "low-income" populations in the project area, Defendants also

marginalized the minority populations within the project area.

143.    Defendants acknowledged in their LS DSEIS that there was an additional

minority community to whom they did not reach out during the planning and drafting

of the LS DSEIS; the 2021 LS FSEIS does not document the steps, if any, taken later with

this community.  The LS DSEIS executive summary states:

> "During the LS DSEIS review of the Selected Alternative, minority
> populations were also identified adjacent to Pine Street between
> Kilburn Street and Flynn Avenue. It has been determined the project
> will have minimal effects to this community. There will be additional
> outreach to this community once the LS DSEIS is released."

144.    As detailed in the Pine Street Coalition comments on the LS DSEIS, and

specifically in an expert statement by Professor Miriam Dash, Defendants selectively

manipulated Census data to marginalize minority populations in the project area. By

any applicable standard, Census Tract 10 is higher in minority populations than the

rest of Burlington, and the Maple-King neighborhood is significantly higher in minority

residents even than the rest of Census Tract 10.

145.    In addition to Defendant's insufficient efforts to identify minority and

low-income *communities* — as opposed to census tracks and census blocks — Defendants

have failed to adequately assess negative impacts on the single Environmental Justice

community they identified, the Maple-King Neighborhood.

146.    Of most critical importance, while repeatedly pointing out that, despite

increased traffic volume, signalization – conversion of the present four-way-stop

intersections in the narrow, residential intersections at Pine and Maple, and Pine and King streets to traffic signals favoring the north-south Pine Street traffic -- will result in "smoother traffic flow," "decreased delay," and "vehicles [that] will move more freely through the neighborhood," the authors of the 2021 LS FSEIS never discuss that this means *faster* traffic in the Maple-King Neighborhood.

147.    In the 2021 LS FSEIS, Defendants do not directly state that improving traffic "efficiency" in the Maple-King Neighborhood means increasing traffic speed and, when directly challenged, deny that traffic speed will increase.  However, Defendants cannot have it both ways.  Increased traffic "efficiency" inherently means "more cars moving faster": Traffic speed will increase.

148.    Defendants repeatedly point to the speed limit as if it is an indicator of *actual* traffic speeds. However, they have not updated their traffic data and have never documented the *actual* baseline speed of traffic presently in the Maple-King neighborhood. At the present four-way-stop intersections, any non-expert driver can report that the speed through that neighborhood is presently at a crawling pace, and that crawling pace is safe for the pedestrians and bicyclists which flow seamlessly and constantly across the roads in this neighborhood.

149.    Defendant's 2021 LS FSEIS noise analysis then, illogically, indirectly admits that traffic will be moving faster, but assert, without any apparent support, that "[t]his reduction of 'stop-and-go' traffic and reduction of the time spent idling at the intersections are expected to have a corresponding reduction in traffic noise."

150.    The FHWA Traffic Noise Model is capable of differentiating between stop-and-go and free-flowing traffic conditions, but there is no evidence in the record to suggest that defendants used any model to come to the conclusion that faster-traveling vehicles will result in less traffic noise than the status quo in the Maple-King neighborhood.

151.    The 2021 LS FSEIS fails to analyze the impact of this faster traffic in regard to noise, and fails to meaningfully answer comment on these issues.

152.    The 2021 LS FSEIS fails to analyze noise impacts to the Maple-King neighborhood cumulatively with the Champlain Parkway and Railyard Enterprise Project, and fails to meaningfully answer comment on these issues; together, these two interrelated projects will effectively island the western portion of the neighborhood.

153.    The 2021 LS FSEIS fails to analyze the safety of drivers, bicyclists and pedestrians in light of the increased speed through the Maple-King Neighborhood, and further fails to do so in light of comment on safety and on the fact that there is a higher proportion of pedestrians and bicyclists in this low-income, minority and immigrant neighborhood, and fails to meaningfully respond to such comments. Although the 2021 LS FSEIS makes vague assurances that the Project "will improve safety for all users," it does not assess the degree to which the rate or severity of traffic-related accidents will change.

154.    The 2021 LS FSEIS fails to analyze safety impacts to the Maple-King neighborhood cumulatively with the Champlain Parkway and Railyard Enterprise

Project, and the impact on pedestrians and bicyclists of ringing this neighborhood with two highway projects, and fails to meaningfully answer comment on these issues.

155.    The 2021 LS FSEIS fails to analyze the impact of this faster traffic in regard to community character, particularly in how the project bisects this vital community, acting like a wall for pedestrians and bicyclists between the east and west halves of the neighborhood, particularly to children walking from homes to the King Street Community Center or to school, and fails to meaningfully answer comment on these issues. In response to comments, the 2021 LS FSEIS asserts that there is "no new roadway or change to another physical characteristic that would represent an impact or barrier to the community", *See 2021 LS FSEIS, Champlain Parkway Summarized Responses to Comments, Page 46 of 125*, ignoring the fact that new traffic lights and the change in what the authors call the "efficiency" of traffic is a change in physical characteristic that represents a barrier to the community.

156.    The 2021 LS FSEIS fails to analyze community character impacts to the Maple-King neighborhood cumulatively with the Champlain Parkway and Railyard Enterprise Project, and fails to meaningfully answer comment on these issues; together, these two interrelated projects will effectively island the western portion of the neighborhood. Cumulately, these projects also negate the 2021 LS FSEIS comment quoted above which claims there is "no new roadway".

157.    Defendants have violated NEPA, and violated statute, Executive Order, regulations and agency guidance by failing to fulfill Environmental Justice mandates. Defendants' decision to proceed with the Champlain Parkway project without

compliance with Environmental Justice mandates is arbitrary and capricious, an abuse

of discretion, and contrary to law, or made without observance of procedure required

by law in violation of the APA.

158.    Defendants have failed to take a hard look at potential adverse impacts

upon the Maple-King Neighborhood in the areas of noise, safety, and community

character.  Defendants further failed to meaningfully respond to comments on these

issues. Defendants' actions are unreasonable, arbitrary and capricious.

159.    Unless and until Defendants prepare NEPA-compliant documents which

also comply with Environmental Justice mandates, and provide for and meaningfully

respond to public comment on those documents in accordance with NEPA

requirements, Plaintiff and its members will be irreparably harmed.  The relief Plaintiff

seeks will redress these injuries by requiring Defendants to comply with NEPA and the

APA.

## COUNT IX:
## VIOLATION OF NEPA AND IMPLEMENTING REGULATIONS AND POLICIES, the ENDANGERED SPECIES ACT, AND THE APA: FAILURE TO CONSIDER AND AVOID IMPACTS TO ENDANGERED AND THREATENED SPECIES

160.    Plaintiffs repeat and reallege paragraphs 1 through 159 above as though

more fully recounted herein.

161.    In broad strokes, the ESA seeks to protect and recover imperiled species

and populations by listing them as threatened or endangered based on enumerated

statutory factors, 16 U.S.C. § 1533(a)(1)(A)-(E), using the "best scientific and commercial

data available. 16 U.S.C. § 1533(b). The term "endangered species is defined as "any

species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20)

162.    In 1976, Congress reiterated the distinct importance of critical habitat and the prohibition on adverse modification: It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence. Once a habitat is so designated, the Act requires that proposed federal actions not adversely affect the habitat. If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat. H.R. Rep. No. 887, 94th Cong., 2d Sess. 3 (1976).

163.    Under ESA Section 7, Congress charged each and every federal agency with the affirmative duty to further conservation of imperiled species; the ESA explicitly elevates species protection over the primary missions of federal agencies. 16 U.S.C. § 1536(a). In addition to an overarching affirmative duty, the ESA requires every federal agency to obtain review and clearance for activities that may affect listed species or their habitat. If an activity authorized, funded, or carried out by a federal agency may affect a listed species or its designated critical habitat, that activity cannot go forward until consultation (a biological review of the proposal by FWS or NMFS) ensures that it

will not "jeopardize" the species or result in the "destruction or adverse modification"

of designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

164.     The listing of a species as endangered under the ESA triggers prohibitions

under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take," of

species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill,

trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §

1532(18); see also 50 C.F.R. § 17.3 (harm "means an act which actually kills or injures

wildlife. Such act may include significant habitat modification or degradation where it

actually kills or injures wildlife by significantly impairing essential behavioral patterns,

including breeding, feeding or sheltering."). The prohibitions in ESA Section 9 also

extend beyond intentional take of endangered species to "incidental take," or take that

is not a direct goal of the proposed action. During Section 7 consultation, if FWS or

NMFS concludes that take will not jeopardize the species, then the agency may issue a

written statement that specifies the impacts of the incidental taking on the species,

mitigation measures, reporting requirements, and any other terms and conditions with

which the action agency must comply ("Incidental Take Statement"). 16 U.S.C. §

1536(b)(4)(C).

165.     The March 2019 Re-evaluation of the 2009 FSEIS acknowledges that since

the 2009 FSEIS, an endangered species of bat with recognized habitat in the Champlain

Parkway corridor; several state-listed rare species of fish have been identified at

Englesby and Potash brooks within or near the project corridor; and the state has

identified numerous rare plants within the project corridor.

166.    The Reevaluation at §4.6 states:

> As discussed in Section 3.6.2, the Northern Long-eared Bat (NLEB)
> is listed as an Endangered species in the State of Vermont and
> certain areas of the Project corridor are considered potential
> summer habitat. In accordance with ANR guidance, an acoustic
> survey will be performed since the Project will involve clearing
> between 1-2% of the forested habitat within a one-mile radius.
> Confirmation with ANR (Vermont Fish and Wildlife Department)
> will be completed and is ongoing. If the acoustic survey finds a
> presence of the NLEB, conservation measures for known, occupied
> summer habitats will be applied including time-of-year cutting
> restrictions, applying potential roost tree retention guidelines, and
> minimizing habitat and canopy fragmentation, as applicable and in
> accordance with ANR Regulatory Review Guidance for Protecting
> Northern Longeared Bats and Their Habitats.

167.    The referenced acoustic study must be done between June 1 and July 31

according to ANR[9].

168.    The Defendants have either proceeded to bid, intending to commence

construction on July 1, 2022, without having conducted that required acoustic study; or

they have conducted the study with no public review of its results or their proposed

mitigation plan.

169. In addition to the rare, threatened or endangered species identified in the

2019 Reevaluation, since 2010 Vermont's Agency of Natural Resources has listed 12

additional plant species and thirteen additional animal species as threatened or

endangered. *See Table of Significant Changes, Attachment H.* The project area has not been

reassessed for the presence of these species.

---

[9]https://vtfishandwildlife.com/sites/fishandwildlife/files/documents/Conserve/RegulatoryReview/G
uidelines/Regulatory_Review_Guidelines_for_Protecting_Northern_%20Long-
eared_Bats_and_Their_Habitats_(2-2017).pdf

170.    Although the March 2019 Re-evaluation acknowledges the likelihood of endangered bat summer habitat, and the existence of rare plant and fish habitat, within the Champlain Parkway project area, Defendants have failed to engage in the mandated NEPA Environmental Assessment process where the significance of impacts is unknown without further study, and have failed to undertake the steps necessary to ensure avoidance of taking of endangered species prior to initiating the construction process.

171.    Defendants have violated the Endangered Species Act by failing to take known, necessary steps avoid taking or harm to habitat of endangered species. In so doing, and in failing to undertake, at a minimum, additional Environmental Assessment of potential impacts to endangered species, threatened species, and their habitats, Defendants have failed to fulfill their NEPA mandates. Defendants' decision to proceed with the Champlain Parkway project without complying with Endangered Species Act and NEPA mandates is arbitrary and capricious, an abuse of discretion, and contrary to law, or made without observance of procedure required by law in violation of the APA.

172.    Unless and until Defendants prepare NEPA-compliant documents and provide for public comment on those documents, Plaintiff and its members will be irreparably harmed.  The relief Plaintiff seeks will redress these injuries by requiring Defendants to comply with NEPA, the Endangered Species Act, and the APA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that Defendants' actions violated NEPA, its implementing regulations and policies, and the APA, where the responsible Agency failed to consider connected actions in one NEPA process; and,

B. Declare that Defendants' actions violated NEPA, its implementation regulations and polices, and the APA, where Defendants unlawfully failing to consider the cumulative impacts and indirect effects of the Champlain Parkway with other related and interdependent projects, specifically the Railyard Enterprise Project and the Main Street Great Streets project; and,

C.  Declare that Defendants' actions violated NEPA, its implementing regulations and policies, and the APA, by failing to prepare a full Supplemental EIS, or new EIS, where the agency has made substantial changes in the proposed action that are relevant to environmental concerns, and/or where there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts; and,

D.  Declare that Defendants' actions violated NEPA, its implementing regulations and policies, and the APA, where the responsible Agency failed to take a "hard look" at the environmental impacts of the proposed project, including but not limited to by Defendants' failure to consider the impacts of the proposed project in light of significant changes in statutes, regulations, policies, guidelines, data and methodology bearing on the project and relevant to the project's environmental impacts; and,

E.  Declare that Defendants' actions violated NEPA, its implementing regulations and policies, and the APA, where the responsible Agency failed to engage in reasoned decision-making, including but not limited to by Defendants' failure to consider the impacts of the proposed project in light of significant changes in statutes, regulations, policies, guidelines, data and methodology bearing on the project and relevant to the project's environmental impacts and Defendants' making a determination contrary to evidence before the agency; and,

F. Declare that Defendants' actions violated NEPA, its implementation regulations and policies, and the APA, where the responsible Agency failed to comply with Environmental Justice mandates relative to the NEPA process contained in Executive Orders, statutes, its own regulations and guidance documents; and,

G. Declare that Defendants' action violated NEPA, its implementation regulations and policies, the Endangered Species Act, and the APA, in failing to undertake identified actions necessary for the protection of the endangered Long Eared Bat prior to moving forward with bids for construction, and in failing to take steps necessary to assess unknown impacts on a variety of endangered and threatened species including engaging in appropriate NEPA review; and,

H. Declare that Defendants' actions were arbitrary, capricious and otherwise in violation of law or made without observance of procedure required by law, in violation of the APA; and

I. Vacate and set aside Defendants' actions; and,

J. Issue an injunction requiring Defendants to comply with NEPA, the Endangered Species Act, and the APA; and,

K. Issue an injunction enjoining any activity in furtherance of construction of the Champlain Connector until Defendants have demonstrated compliance with NEPA, the Endangered Species Act, and the APA; and,

L. Retain jurisdiction over this matter until Defendants fully remedy the violations of law described herein; and,

M. Award Plaintiffs their fees, costs, and other expenses as provided by applicable law; and

N. Issue such other relief as the Court may deem just, proper, and equitable.

Pine Street Coalition,
by and through its Legal Counsel,

DATED: 16 May 2022

Cindy Ellen Hill, Esq.
Hill Attorney PLLC
144 Mead Lane
Middlebury VT 05753
802-989-6906
lawyerhill@yahoo.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on 16 May 2022 I filed in hand Plaintiff's Second Amended Complaint (clean copy), Plaintiff's Second Amended Complaint (redline copy), and Attachments A through H to Plaintiff's Second Amended Complaint, with the Clerk of Court.

This Amended Complaint adds no new parties. I have served all Defendants by email to their counsel of record, all of whom are registered parties in the Vermont ECF filing system and thus have consented to accept service by email:

For FHWA:  Ben.Weathers-Lowin@usdoj.gov
AUSA Ben Weathers-Lowin

For VTrans: Leslie.Welts@vermont.gov
Attorney Leslie Welts

For the City of Burlington: jrose@dunkielsaunders.com
Attorney Jonathan Rose

To the best of my knowledge, there are no non-registered participants in this matter.

5.16.2022

Hill Attorney PLLC
144 Mead Lane
Middlebury VT 05753
802-989-6906
lawyerhill@yahoo.com
hillattorneypllc@gmail.com